Argued and submitted January 13, judgments of conviction, sentence of death and
sentence of life imprisonment without the possibility of parole affirmed
April 2, 2004

# STATE OF OREGON,
*Respondent,*

*v.*

# ERIC WALTER RUNNING,
*Appellant.*

## (CC 9802-31142; SC S47842)

87 P3d 656

Eric Johansen, Deputy Public Defender, Salem, argued the cause for appellant. David E. Groom, Acting Executive Director and Mary M. Reese, Senior Deputy Public Defender, filed the brief for appellant.

Timothy A. Sylwester, Attorney-in-Charge Collateral Remedies and Post-Conviction Unit, Salem, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, Jennifer S. Lloyd, Assistant Solicitor General, and Kathleen Cegla, Assistant Attorney General.

DE MUNIZ, J.

**DE MUNIZ, J.**

This case is before the court on automatic and direct review of a judgment of conviction and sentence of death. ORS 138.012(1); ORAP 12.10(1); *State v. Lotches*, 331 Or 455, 457 n 1, 17 P3d 1045 (2002). Defendant seeks reversal of his convictions for two counts of aggravated murder involving two victims and one count of felon in possession of a firearm. In the alternative, defendant requests that this court vacate his sentence of death and his sentence of life imprisonment without the possibility of parole, and remand the case for resentencing. For the reasons that follow, we reject each of defendant's assignments of error and affirm the convictions for aggravated murder, the sentence of death and the sentence of life imprisonment without the possibility of parole.

## FACTS

Because the jury found defendant guilty of all the crimes charged, we review the evidence in the light most favorable to the state. *State v. Hale*, 335 Or 612, 614, 75 P3d 448 (2003).

Although we discuss the events leading up to the murders in greater detail below, the immediate facts surrounding the murders can be summarized briefly. At approximately 11:20 p.m. on February 24, 1998, defendant entered the Ambassador Restaurant and Lounge on Sandy Boulevard in Northeast Portland armed with a short-barreled shotgun. There were approximately 20 people in the restaurant. When defendant entered the restaurant, he encountered Gilpin as she walked toward the restaurant's entrance, and he shot her on the right side of her abdomen. Defendant then proceeded toward the back of the restaurant where there was a room with pool tables. Anderson was in that room. Defendant entered and shot Anderson in the left hip at close range. After she fell to the floor, defendant aimed the gun very closely to Anderson's left cheek and fired, killing her. Defendant then left the pool room and walked toward the entrance of the bar. As he approached the entrance, he encountered Gilpin's body. Defendant stopped, kicked the body and, although it appeared that she already had died, defendant placed the gun above Gilpin's left ear, and shot her

again. Defendant hesitated before leaving the bar and made a gesture as if he intended to return to the pool room. He opted, however, to leave the bar using the same door through which he had entered.

After defendant left the Ambassador, a witness overheard him say to himself "I got to get me the fuck out of here." He then ran toward the back of the Ambassador's parking lot and hopped over a fence. As defendant ran, his gun again discharged. Approximately one block south of the Ambassador, defendant hid the shotgun between a metal storage shed and stacks of firewood that lined the fence to Clark's backyard. Clark discovered the gun approximately two months after the shootings.

A brief history of defendant's life and his relationships with the victims is necessary to a complete understanding of the events of February 24, 1998, and to our resolution of the issues that this opinion addresses. We now turn to that history and then to the circumstances surrounding the events of February 24, 1998.

Defendant was born in 1951 in San Francisco, California. Until shortly before the murders of Anderson and Gilpin, defendant believed that his biological parents were Lillian Fern Running[1] and Harry Walter Running. In fact, although their names were on his birth certificate, the Runnings were not defendant's biological parents. The couple had met a young, pregnant woman, described as Spanish, named Ford who did not want to keep her child. They invited Ford to live with them, and they supported Ford during the pregnancy. When Ford gave birth, the couple paid her a sum of money and took the child as their own. Later on in his life, because he looked different from the rest of his family, defendant began to suspect that he had been adopted and periodically would ask Harry Running whether he was adopted. Harry always responded that defendant was not adopted.

The Runnings were heavy drinkers, particularly Lillian Running, and they periodically engaged in oral altercations. When defendant was 18 months old, Lillian Running

---

[1] Defendant's birth certificate lists his birth mother as Lillian Fern Reese. However, Lillian also went by her married name, Lillian Running.

left the family. She did not have any contact with defendant after he was four years old.[2] Harry's mother helped him care for defendant before Harry married his second wife, Marion Running, in 1960. Marion also was a heavy drinker, and neither Harry's mother nor Marion were loving toward defendant. Harry often would beat defendant with straps, sticks, cords, belts, coat hangers, and by hand.

Defendant became an alcoholic and a drug addict. He began drinking alcohol at the age of 11 and became a heavy, daily drinker by the time of the shootings.[3] Defendant also had regularly used marijuana since the age of 13, LSD since the age of 15, methamphetamine since high school, and had used cocaine intravenously since the age of 20. Defendant had experimented with heroin, crack cocaine, PCP, Dexedrine, and pain pills.

Defendant met Anderson in 1996 and fell "madly in love" with her.[4] Though the date is unclear, the couple began living together soon thereafter. Anderson previously had been involved in a 10-year romantic relationship with Gilpin and had lived with Gilpin near Seaside. Gilpin and Anderson had maintained contact with each other after their relationship ended, and it eventually appeared to defendant that Anderson would end her relationship with defendant to return to her previous relationship with Gilpin.

Anderson was aware of defendant's concerns that he had been adopted and had attempted to quell those fears by assuring him that he probably had not been adopted. She was with defendant at Harry Running's home in February 1997 when, during a heated discussion, Harry admitted to defendant, "You're damn right, you are adopted." Defendant was upset by the news and later told Dr. Kirschner, a psychologist and defense witness, that he "felt devastated, angry, enraged in two places at the same time. My DNA was

---

[2] In approximately 1995, Harry discovered that Lillian Running had died when he read her obituary.

[3] Defendant experienced a five-year period of sobriety during the 1980s while he was in his thirties.

[4] Stites, an ex-girlfriend of defendant's with whom defendant had remained close, testified at trial that defendant was obsessed with Anderson.

scattered. Scattered. I was viewing myself from another place. Split. Numb."

Defendant's relationship with Anderson began to deteriorate shortly after defendant learned that he had been adopted. Defendant also began to drink more heavily and was admitted to the Hooper Detoxification Center in Portland at least five times between the time that he learned of the adoption and the day of the shootings.[5]

On the day of the shootings, Anderson and defendant had eaten lunch together, and had met each other later in the evening when, after talking, drinking, and smoking, "ended up at the Ambassador." The time of the couple's arrival at the Ambassador is unclear but, once there, they began to play pool. The bartender served defendant and Anderson each a drink. Soon thereafter, Anderson used the telephone for approximately 10 to 15 minutes. A brief time after she returned to the pool room, the bartender noticed defendant and Anderson quietly arguing with each other. After a few minutes, defendant left the pool room and sat at the bar. Defendant did not order a drink and, as Foong, the bartender, testified, "just sat at the bar kind of glaring" for about 10 minutes. During that time, Anderson remained in the pool room alone.

At approximately 8:00 p.m., after sitting at the bar for a few minutes, defendant left the Ambassador alone without saying anything to Anderson. Shortly after defendant left, Anderson again used the pay telephone for about 20 minutes. After making that call, Anderson ordered another drink and began looking through a book of karaoke songs. Gilpin subsequently joined Anderson at the bar at approximately 10:00 p.m., and she ordered a drink for each of them. After sitting at a table in the bar area until about 10:45 p.m., Anderson and Gilpin ordered dinner from a waitress and moved into the pool room to play pool.

At about 11:15 p.m. Anderson returned to the bar and ordered more drinks for herself and Gilpin. Defendant

---

[5] Individuals admitted to the Hooper Detoxification Center typically arrive there because they were extremely intoxicated in a public place and either concerned citizens or police officers pick them up and take them there.

returned to the bar at about the same time, approached Anderson, and stated "[c]ome outside right now, you fucking bitch. I'm going to kill you." He then pulled an index finger across his throat. In response, Anderson rolled her eyes at the bartender and stated to the waitress, "I don't like him very much anymore." Defendant then left the bar and Anderson returned to the pool room with the drinks. Almost as soon as Anderson returned to the pool room, the bartender observed Gilpin walk into the bar area with a pool cue and walk toward the front entrance. At that point, defendant re-entered the bar with the shotgun and, as described above, killed both Gilpin and Anderson.

After discarding the weapon, defendant returned to his apartment. The next morning, defendant's landlord saw defendant leave his apartment with two large garbage bags. At approximately 10:00 a.m., defendant went to the "All That Glitters" pawn shop in downtown Portland and sold the leather jacket that he was wearing when he committed the murders. Later, at approximately 4:00 p.m., defendant saw a friend, Campbell, and asked Campbell whether he could use Campbell's telephone because he needed a "callback" telephone. Defendant used Campbell's telephone to contact someone from whom he could purchase heroin.

After using Campbell's telephone, defendant visited with Inklebarger, whom he saw on two occasions after he had committed the crimes. On the first occasion, Inklebarger noticed that defendant had cut his hair and was wearing glasses. Inklebarger testified, however, that defendant "hardly ever [wore] glasses." On the second occasion, Inklebarger went to purchase some beer for himself and defendant, when he noticed defendant's picture in the newspaper associated with a story regarding the murders of Anderson and Gilpin. When Inklebarger returned to his apartment, he told defendant that defendant really had "screwed up," and defendant acknowledged as much by stating that he had "really fucked up."

Later that day, the two men also visited with Inklebarger's neighbor, Shade, and defendant admitted to Shade that he had shot Anderson and Gilpin. Defendant also told Shade that he had gotten scared and had thrown the

shotgun away in some bushes. Defendant asked Shade what he thought defendant should do, and Shade told him that, "the way [he] saw it, [defendant] had three options. He could get [ ] a lawyer and turn himself in, or he could go on the run for the rest of his life, or [ ] he [could] blow himself away." Shade thought that defendant took what he had said seriously, but that defendant did not "particularly like [ ] the last [option]."

While the men were at Shade's apartment, a news story came on the television about the murders and, during the course of the story, defendant's picture appeared on the television screen. Shade asked defendant what he had done during the hours before the killings. Defendant responded that he had tried to contact someone with whom he could discuss how he was feeling and who could talk him out of killing Anderson, but he had not been able to "get a hold of anybody."

At approximately 7:30 p.m. that evening, a police officer responded to the report of an assault victim at a construction site on the corner of Southwest 15th Street and Alder Street in Portland. The victim had a severe cut on his throat that looked as if it had been caused by a sharp instrument. Upon arrival at the hospital, the victim stated that he wished that he had used the last shot in the shotgun on himself instead of throwing it into the bushes. And later, while being prepared for surgery, the victim identified himself as "Rick Jackson." The victim, in fact, was defendant.

In the meantime, the police had begun investigating the Anderson and Gilpin murders immediately after they occurred and, in the early hours of the morning after the shootings, the police contacted Anderson's mother. She told the officers that her daughter had been living with defendant, and she gave them his address. Later that day, the police obtained a warrant to search defendant's apartment. Once there, they seized many items, including a book titled "Blue Book of Gun Values" and a box of .12 gauge shotgun shells. The police also found a bundle of human hair in a wastebasket beneath the kitchen sink.

By conducting a trace on the murder weapon, the police concluded that, at the time of the shootings, it belonged to Gilpin.

## PROCEDURAL HISTORY

Defendant eventually was arrested and charged with two counts of aggravated murder and one count of being a felon in possession of a firearm.

At trial, defendant contended that he lacked the requisite *mens rea*—intent—to support the charge of aggravated murder and that he was under the influence of an extreme emotional disturbance at the time that he killed Anderson and Gilpin. Kirschner testified that, when defendant committed the murders, he suffered from a disassociative disorder and was in a disassociative state. Defendant's disorder, Kirschner explained, resulted from a "cumulative trauma of rejection" that began when defendant was 18 months old when Lillian Running, the woman defendant believed was his biological mother, left the family. Compounding the effect of that event, Kirschner testified, defendant subsequently had negative experiences being raised by Harry Running's mother and Marion Running. Defendant thus had lacked a nurturing and loving mother-figure and Anderson, Kirschner opined, became for defendant the "symbiotic partner/mother-figure" that he had been seeking since Lillian Running left the family.

Thus, Kirschner theorized, on the night of the shootings, when defendant sensed that Anderson planned to leave him to return to her previous relationship with Gilpin, that caused defendant to experience "an acute catathymic crisis,"[6] which caused defendant to go into a disassociative state or, in other words, to experience a "brief psychotic disorder." "The trigger mechanism," Kirschner explained, "invariably ha[d] to do with rejection, abandonment."

Kirschner explained that disassociative disorder has "various major symptoms," only one of which is necessary for

---

[6] Kirschner's psychological evaluation, quoting a textbook, defined "acute catathymic crisis" the following way: " '[T]he acute catathymic process taps deeper sources of emotional tension than situational acts or assaults brought on by specific conditions, and is triggered by an overwhelming emotion attached to an underlying emotional conflict. Many times the perpetrator of the assault cannot give a logical explanation for the act; and in many, but not all cases, he only partially recalls it.' "

a person to be diagnosed with the disorder. Kirschner theorized that defendant likely suffered from disassociative amnesia, which occurs when "a person might do something and totally be fogged out, amnesic for the event." Kirschner also believed that defendant had behaved consistently with two other major symptoms of disassociative disorder: identity confusion and identity alteration.[7] Kirschner supported his theory by quoting statements that defendant made to the state's psychologist, Dr. Hulteng. For example, Kirschner noted that defendant told Hulteng that, when he realized that Anderson planned to leave him, he

> "felt all of this going to end. I was actually madly in love with this woman and did not dismiss the idea that perhaps some day we could find happiness together or that we could remain happy in a way for as long as time would allow. Yet, all of this seemed to be suddenly destroyed."

Kirschner also theorized that defendant "was most probably in a state of disinhibition and weakened ego controls * * * because of self-medication for an underlying depression, via excessive drug and/or alcohol abuse."[8]

The jury convicted defendant, as charged, of two counts of aggravated murder and one count of being a felon in possession of a firearm. At the conclusion of the penalty phase of defendant's trial, the jury determined that defendant should be sentenced to death for the murder of Anderson and to life imprisonment without the possibility of parole for the murder of Gilpin. The court sentenced defendant in accordance with the jury's determinations.

---

[7] In a psychological evaluation of defendant, Kirschner explained that "[t]he major symptom of identity confusion is a subjective feeling of uncertainty, puzzlement, or conflict about one's identity. That is often accompanied by a struggle as to who one is, or an inner battle regarding identity." (Emphasis omitted.) The evaluation explained further that "[t]he major symptom of identity alternation, is defined as 'behaviors that are the manifestations of the assumption of different identities, such as referring to oneself by different names[,] being told by others that he or she has been acting like a completely different person[, and] severe mood change (especially if accompanied by amnesia).' " (Emphasis omitted.) That defendant often went by false names led Kirschner to conclude that defendant possessed the symptoms for identity alternation.

[8] We express no opinion whether Kirschner's testimony was evidence that properly may be characterized as extreme emotional disturbance evidence.

Defendant now raises 36 assignments of error. After a careful review of each of those assignments of error, we reject each one. Of those assignments of error, three merit specific discussion. We address those assignments below.

## PRETRIAL ASSIGNMENT OF ERROR

■ In his fourth assignment of error, defendant argues that the trial court erred when it granted a motion to quash subpoenas *duces tecum* that defense counsel had issued to the State Court Administrator, Click, and the Multnomah County Trial Court Administrator, Bray. The subpoenas required Click and Bray to produce essentially all the information that their offices possessed that was related to jury selection in Oregon.[9]

Click and Bray, through counsel, filed a motion with the trial court to quash the subpoenas. That motion resisted the subpoenas on four grounds: (1) that "[t]he information sought through the subpoenas *duces tecum* [was] not material and favorable to the defense"; (2) that ORS 10.215 "preclude[d] discovery of the jury lists"; (3) that "[s]ource, master and term jury lists are not public records and no statutory or constitutional provision requires disclosure of jury lists"; and (4) that "[b]ecause [defendant was] unable to prove a *constitutionally significant* underrepresentation of a racial or minority group, producing the jury records [would be] of no value to the defense." (Emphasis in original.) In oral arguments on the motion before the trial court, counsel for Click and Bray also stated that he had given defense counsel a copy of the disk that the trial court administrator used to select juries. He argued that, "if [defense counsel] or the defense bar chose to do so, they could purchase copies of the voter registration list as well as the lists of registered voters in this state

---

[9] For example, the subpoena required, among several other things, production of

"[a]ll records, including but not limited to correspondence, e-mail, letters, office memorand[a], Court Orders or memorand[a], minutes of meetings of state court personnel or trial court personnel, pertaining to * * * the establishment and implementation of jury selection in the State of Oregon, [and] policies and procedures for jury selection, juror eligibility, juror qualification, juror empanelment, [and] ascertaining felony or misdemeanant status of prospective jurors[.]"

or within this county and perform the same process that we have performed to determine whether or not there's some violation of [defendant]'s rights." He also argued that no court had ruled that using voter registration and Driver and Motor Vehicles Services (DMV) lists to create jury lists (as Oregon does) was a constitutionally defective method of selecting petit juries.

In response, defense counsel acknowledged that counsel for Click and Bray was correct that she could obtain a list of registered voters and lists of licensed drivers from DMV, and that, using the disk, she "could generate [her] own master list of jurors[.]" However, defense counsel argued, the fact that she could obtain access to those materials necessarily undermined the state's argument that the jury information that the defense sought was confidential. To the contrary, defense counsel argued, defendant's request for the jury information was akin to seeking discovery. She further disclaimed any reliance on *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963), which held that the suppression "of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." She argued:

> "Essentially, we are asking for discovery, discovery that is pertinent to a statutory provision which allows the defendant to challenge the jury panel on the ground that there has been a material departure from the requirements of the law governing the selection of juries; that we're entitled to discover that information and evaluate that information and to insure that Mr. Running is guaranteed a trial of impartial jurors drawn from a fair cross-section of the community."

Defense counsel indicated that the basis for her concern that the jury would not represent a fair cross-section of the community was that the proscription against persons with felony convictions serving on juries could serve to exclude a disproportionate number of racial and ethnic minorities.

The trial court granted the motion to quash the subpoenas *duces tecum*, explaining briefly in a letter opinion that "there ha[d] been an inadequate showing by the defense that

the materials requested are either material and/or favorable to the defense. Nor has the defense shown that such material is otherwise available by statute." Beyond the request for the jury lists via subpoena, defendant did not otherwise challenge the composition of the jury by, for example, filing a motion supported by information that he could have obtained on his own.[10]

In this court, defendant argues that the trial court erred for two reasons when it quashed the subpoenas. First, defendant asserts that the trial court erred because *State ex rel Click v. Brownhill*, 331 Or 500, 15 P3d 990 (2000), decided after the trial court ruled on the motion to quash, held that ORS 10.215(1) does not preclude "use" of information related to jury selection records by a defendant in a criminal action.[11] Second, defendant asserts that the trial court erred when it quashed the subpoenas on the ground that defendant had failed to make a showing that the jury selection records were material and favorable. Rather, defendant argues, he is entitled to the jury selection records pursuant to ORS 136.580, the statute governing the issuance of subpoenas *duces tecum*.[12] That statute provides:

---

[10] Click and Bray's motion to quash the subpoenas *duces tecum* explained:

"The procedures for selecting and summoning juries in circuit court are set forth in ORS 10.205 to ORS 10.265. The State Court Administrator has implemented many of these procedures through the operation of data processing programs. The source lists are the [DMV] files and the most recent electors [—defined by ORS 247.002 as 'individual[s] qualified to vote under section 2, Article II, Oregon Constitution'—] of the county. After the lists are merged into a master jury list, the term list (jury pool list) is prepared 'by selecting a random starting point on the *jury source list*, then selecting every *n*th name until the number of jurors selected equals the number request[ed]' by the judicial district. The same random method is used in selecting individual jury panel lists."

(Emphasis in original; internal citations and footnotes omitted.)

[11] In his Memorandum of Additional Authorities, defendant also argues that this court's decision in *State v. Rogers*, 334 Or 633, 55 P3d 488 (2002), supports his argument. We do not agree. Even though the court addressed a similar issue in *Rogers*, ORS 10.215 had been amended by that time, and its text was different from what it had been at the time of defendant's trial. Specifically, the legislature had amended ORS 10.215 "to provide procedures for criminal defendants to obtain jury lists." *Id.* at 636. The analysis relating to ORS 10.215 in *Rogers* does not apply here.

[12] Defendant also argues that the trial court's decision to quash the subpoenas violated his state and federal constitutional rights to compulsory process. He acknowledges that he did not raise that argument before the trial court, but asserts that such a claim "is implied when a defendant attempts to compel the production

> "(1) If books, papers or documents are required, a direction to the following effect shall be added to the form provided in ORS 136.575: 'And you are required, also, to bring with you the following: (describing intelligibly the books, papers or documents required).

> "(2) Upon the motion of the state or the defendant, the court may direct that the books, papers or documents described in the subpoena be produced before the court prior to the trial or prior to the time when the books, papers or documents are to be offered in evidence and may, upon production, permit the books, papers or documents to be inspected and copied by the state or the defendant and the state's or the defendant's attorneys."

Defendant asserts that, had he received the jury selection records, he would have "use[d] the lists to determine whether the jury panel selection procedure substantially complied with all requirements of statutory and constitutional law." However, he argues, when the trial court quashed the subpoenas, he "was unlawfully deprived of the means and opportunity to mount a statutory and constitutional challenge to the composition of the jury panel." The practical import of defendant's argument is that, because he did not obtain the jury selection records, he was precluded from determining whether the jury selection for his case complied with the requirements of law and, therefore, was precluded from challenging the make-up of his jury. Thus, in light of *Click* and his interpretation of ORS 136.580, defendant argues that this court should remand the case to the trial court for a hearing on the issue, thereby permitting defendant to advocate for and to potentially receive a new trial.

For defendant to prevail on this assignment of error, we must conclude that defendant has either a statutory or a constitutional right to obtain the jury selection records. At the outset, we note that defendant expressly disclaimed having a constitutional right to obtain the jury selection records.

---

of evidence via a subpoena *duces tecum* and that subpoena is quashed," an argument with which we disagree. Because, as defendant acknowledges, he did not preserve that argument, and because we do not believe that it reflects an error apparent on the face of the record, we decline to address it.

We therefore need only decide whether defendant has established a statutory right to obtain the jury selection records. We begin with a discussion of *Click*'s applicability to this case.

In that case, the relators[13] sought "a peremptory writ of mandamus commanding the trial court to vacate an order that require[d] [them] to provide certain jury lists to the defendant in a pending criminal case." *Click*, 331 Or at 502. The defendant had served the relators "with subpoenas *duces tecum* requesting, among other things, a number of jury-related records, including Clatsop County source lists, master lists, term lists, and individual *voir dire* lists from 1990 to the date of the subpoena." *Id.* The relators filed a motion to quash the subpoenas based in part on their assertion that they "were precluded from disclosing the jury lists under ORS 10.215(1)." *Id.* The trial court denied the motion, but narrowed both the scope of the materials to which the defendant would be allowed access and the scope of the defendant's use of the materials. *Id.*

*The relators then sought a writ of mandamus from this court directing the trial court to grant their motion to quash the subpoena. Id.* This court addressed the issue "whether ORS 10.215(1), by implication, prohibits [the court administrators] from providing th[e] lists to [the defendant]." *Id.* at 502-03. The court, employing this court's statutory construction methodology, concluded that it did not. *Id.* at 508.

This court's conclusion was based primarily on four observations: (1) ORS 136.005(1) provided that both the district attorney and a criminal defendant could challenge the jury panel "on the ground that there has been a material departure from the requirements of the law governing the selection of jurors[;]" (2) the "requirements of the law governing selection of jurors" could be found in ORS chapter 10; (3) ORCP 57 A also provided for a challenge to the jury for "substantial failure to comply with the applicable provisions of ORS chapter 10 in selecting the jury[;]" and (4) ORCP 57 A also provided that "the [party challenging the jury] is entitled

---

[13] The relators were Click, the State Court Administrator, and the Clatsop County Trial Court Administrator. The case did not identify the Clatsop County administrator by name.

to present in support of the motion: * * * *any relevant records and papers not public or otherwise available* used by the clerk or court administrator[.]" *Id.* at 506-08 (emphasis in original). Based on those observations, the court noted that ORCP 57 A(2) allowed a party in a civil case access to the type of information that the defendant was seeking. The court noted further that it was "difficult to imagine that the legislature intended to give civil litigants greater access to records and papers than it gives criminal litigants." *Id.* at 508. The court thus concluded that "the legislature's intent respecting use of jury lists for the purposes contemplated by [the defendant] is clear: Such a use is permissible." *Id.*

From the foregoing, it is apparent that the question in *Click* was not whether a defendant in a criminal case has either a statutory or constitutional right to jury selection records. As noted, the question instead was whether the then-extant version of ORS 10.215(1) impliedly, but absolutely, *prohibited* the relators in that case from disclosing the jury selection records. Although the answer to that question was "no," stating the negative did not announce the positive. Because *Click* did not establish any blanket rule giving criminal defendants a right to obtain jury selection records from the court administrators' offices, that case does not provide a basis for reversing the trial court's decision.

Defendant, however, also argues that, in issuing the subpoenas to Click and Bray, he was relying on ORS 136.580 as a discovery statute. He argues that he was entitled, therefore, to obtain the jury selection records, via subpoena, just as he is entitled to obtain discovery under the criminal discovery statutes. However, this court recently explained in *State v. Cartwright*, 336 Or 408, 415-16, 85 P3d 305 (2004), that ORS 136.580 is not a discovery statute. There, this court explained:

> "There are two important points to be drawn from the words of ORS 136.580(2). First, subsection (2) presupposes the existence of a subpoena *duces tecum* issued in accordance with ORS 136.567 and ORS 136.580(1), *i.e.*, one that properly summons documentary materials to trial or to some other court proceeding where they 'are to be offered in evidence.' The provision thus allows parties to ask for *early* production of material that, in the ordinary course and as a

matter of right, will be available for evidentiary use at the proceeding to which they already have been subpoenaed. Second, the trial court's decision to deny or accede to a request for such early production under ORS 136.580(2) is within the court's discretion: The statute states that 'the court *may* direct that the books, papers or documents described in the subpoena' be produced early. (Emphasis added.)

"* * * [D]efendant was attempting to use the subpoena as a discovery device to command the early production of the audiotapes, either to the court or to himself. However, as we have explained, the statute on which he relies does not appear to grant him such authority and, absent such authority, the trial court acted properly in quashing the subpoena."

We reaffirm our conclusion in *Cartwright* that ORS 136.580 does not allow a criminal defendant to use the subpoena *duces tecum* as a discovery device. It necessarily follows that ORS 136.580 also does not provide defendant with a statutory right to obtain the jury selection records that he sought here.

The trial court did not err when it granted Click and Bray's motion to quash defendant's subpoena *duces tecum*.

## GUILT-PHASE ASSIGNMENT OF ERROR

In defendant's eighteenth assignment of error, he argues that the trial court erred when, during the guilt phase, it instructed the jury that the jury could consider the affirmative defense of extreme emotional disturbance (EED) *only* if the jury first concluded that defendant was not guilty of committing aggravated murder. The trial court instructed the jury as follows:

"Now, the next instruction deals with the affirmative defense of extreme emotional disturbance. Only if you find the defendant not guilty of Aggravated Murder may you consider the defense of extreme emotional disturbance, which is the defense which applies only to the charge of Intentional Murder.

"An intentional homicide that would otherwise constitute murder is reduced to Manslaughter in the First Degree

if, at the time of the homicide, the defendant was under the influence of extreme emotional disturbance."

Defendant acknowledges that this court previously has ruled that the affirmative defense of extreme emotional disturbance does not apply to aggravated murder as charged here. *See State v. Moore*, 324 Or 396, 411-13, 927 P2d 1073 (1996) (so holding). However, defendant argues specifically that, "[a]lthough the defense of EED does not apply to the murder that was charged as the aggravated murder, it does apply to the intentional murder that the state would have to prove as an aggravating circumstance to that murder." He points further to the evidence that he presented at trial about his state of mind at the time of the murders and argues that, "if the jury believed that defendant was acting under the influence of an extreme emotional disturbance when he killed Jacqueline Anderson, then he would be culpable for manslaughter, not murder." And, therefore, defendant argues, the "jury would have acquitted defendant of both counts [of aggravated murder]." In defendant's view, the trial court's actions "deprived [him] of this plausible route to acquittal." As we understand defendant's argument, he posits essentially that, because he committed the second murder while under the influence of an extreme emotion disturbance, he should have received the benefit of the affirmative defense provided in ORS 163.115(1)(a). In other words, the jury should have been able to decide the merits of defendant's EED defense in determining whether the state had proven all of the elements of aggravated murder. Although phrased differently, that argument is almost identical in substance to the argument that the defendant presented in *Moore*. 324 Or at 411-12.

■   When called upon to interpret a statute, this court utilizes the paradigm set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). As a part of that paradigm, the court considers not only the wording of the statute, but also the previous constructions that this court has given that wording. Ordinarily, this court treats such constructions as authoritative. That is, the familiar doctrine of *stare decisis* is applicable to such circumstances. Here, defendant's arguments are the same as those advanced by the defendant in *Moore*. Thus, we already have

considered and rejected them in *Moore*. Those arguments afford no occasion or justification to consider modifying our decision in *Moore*. *Moore* controls here.

The trial court did not err by instructing the jury in the manner that it did.

## PENALTY-PHASE ASSIGNMENT OF ERROR

In defendant's thirty-sixth assignment of error, he argues that the trial court erred when it ordered that he serve his sentence of life imprisonment without the possibility of parole consecutively to his death sentence. Defendant specifically "does not challenge the court's decision to impose consecutive sentences." We therefore assume, for the purposes of this discussion, that the trial court properly ordered that the sentences run consecutively. Our inquiry therefore is limited to whether the trial court properly ordered that defendant must serve the life sentence consecutive to the death sentence.

Defendant argues that the trial court violated ORS 163.105(1)(b) by "deferring" defendant's life sentence. That statute provides that "[a] person sentenced to life imprisonment without the possibility of release or parole under this section shall not have that sentence suspended, deferred or commuted by any judicial officer[.]" The state argues that defendant relies too heavily on the word "defer." If defendant is correct, the state argues, then any defendant the court sentences both to death and to life without the possibility of parole is immune from the death sentence. The defendant, according to the state, would be obliged first to serve the entire life sentence before any other sentence could be executed. Rather, the state proposes, the purpose of ORS 163.105(1)(b) is to "preclude *a court* from setting aside, staying or reducing *the term* of the mandatory life sentence." (Emphasis in original.) Thus, the state argues, when a sentencing court orders a defendant to serve his life sentence without the possibility of parole consecutively to his death sentence, the court is not deferring the sentence. Instead, "the term and full execution of that life sentence remains unaffected by the consecutive-sentence order."

■     This court has not interpreted ORS 163.105(1)(b) previously and, in so doing, we apply the statutory interpretation methodology set out in *PGE*, 307 Or at 610-12. As noted, ORS 163.105(1)(b) provides that "[a] person sentenced to life imprisonment without the possibility of release or parole under this section shall not have that sentence suspended, deferred or commuted by any judicial officer[.]" In determining the legislative intent, we give words of common usage their plain, natural, and ordinary meaning. 317 Or at 611. The dictionary defines "deferred" as "to postpone"; "delay"; "to put off." *Webster's Third New Int'l Dictionary* 591 (unabridged ed 1993). The dictionary also states that "[d]efer indicates a delaying or putting off till a later time, often in recognition of developments that prevent proceeding[.]" *Id.*

We agree with the state that, when a trial court imposes a life sentence without the possibility of parole to be served consecutively to a death sentence, that does not mean that the court has "postponed," "delayed," or "put off" the life sentence in violation of ORS 163.105(1)(b). Rather, the life sentence remains currently in force. It will be extinguished, however, at the time that the state carries out a defendant's death sentence.

We do not need to look further than the text and context of ORS 163.105(1)(b) to conclude that the trial court did not "defer" defendant's life sentence in violation of that statute. We therefore conclude that the trial court did not err when it ordered defendant's life sentence without the possibility of parole to be served consecutively to the death sentence.

## CONCLUSION

We have reviewed all defendant's assignments of error and have concluded that none is well taken.

The judgments of conviction, the sentence of death and the sentence of life imprisonment without the possibility of parole are affirmed.