Argued and submitted June 10, 2019; reversed and remanded with instructions to grant petitioner relief by vacating the sentence of death, otherwise affirmed September 23, 2020

ERIC WALTER RUNNING,
*Petitioner-Appellant,*

*v.*

Brandon KELLY,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
05C10295; A163582

475 P3d 450

Petitioner appeals a judgment denying him post-conviction relief, contending, among other points, that the post-conviction court erred when it concluded that petitioner's trial counsel's failure to call an expert on the topic of future dangerousness during the penalty phase of petitioner's criminal trial did not cause petitioner prejudice. *Held*: The post-conviction court erred. Petitioner met his burden of showing that there was "more than mere possibility" that the outcome of the penalty phase of petitioner's criminal trial would have been different if his trial counsel had called an expert during the penalty phase on the issue of future dangerousness. That is, there was "more than mere possibility" that petitioner would not have been sentenced to death if his trial counsel had called an expert during the penalty phase of petitioner's criminal trial on the issue of future dangerousness.

Reversed and remanded with instructions to grant petitioner relief by vacating the sentence of death; otherwise affirmed.

Joseph C. Guimond, Senior Judge.

Daniel J. Casey argued the cause and filed the opening and reply brief for appellant. Eric Walter Running filed the supplemental briefs *pro se*.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

Reversed and remanded with instructions to grant petitioner relief by vacating the sentence of death; otherwise affirmed.

**TOOKEY, J.**

In 1998, petitioner killed two women in a Portland restaurant and was convicted of two counts of aggravated murder and one count of being a felon in possession of a firearm. *See generally State v. Running*, 336 Or 545, 87 P3d 661, *cert den*, 543 US 1005 (2004) (setting forth facts underlying petitioner's convictions). For one count of aggravated murder, petitioner was sentenced to death. For the other count of aggravated murder, petitioner was sentenced to life without the possibility of parole. On direct review, the Supreme Court affirmed petitioner's convictions and sentences. *Id.* at 564. He then petitioned for post-conviction relief, contending that, during his criminal trial, his trial counsel rendered constitutionally inadequate and ineffective assistance of counsel.

More specifically, in the post-conviction proceeding, petitioner alleged, among other points, that his trial counsel rendered inadequate and ineffective assistance because they failed to retain an expert and present expert testimony on the topic of petitioner's "future dangerousness" during the penalty-phase of petitioner's criminal trial. The post-conviction court concluded that petitioner's trial counsel's failure to present expert testimony during the penalty phase on the issue of future dangerousness was "inexcusable under the circumstances of this case and [that] this failure falls below the acceptable standard of conduct." Nevertheless, it concluded that that failure did not prejudice petitioner and denied petitioner post-conviction relief.

Petitioner appeals the judgment denying him post-conviction relief and, in his first assignment of error, argues that the post-conviction court erred when it concluded that he was not prejudiced by his trial counsel's failure to call an expert witness on the subject of future dangerousness. We agree with petitioner.

Consequently, we reverse and remand the judgment and instruct the post-conviction court to grant petitioner relief by vacating his sentence of death.[1]

---

[1] Our resolution of petitioner's contention regarding trial counsel's failure to present expert testimony on the subject of future dangerousness obviates the

We review judgments granting or denying post-conviction relief for errors of law. *Heroff v. Coursey*, 280 Or App 177, 179, 380 P3d 1032 (2016), *rev den*, 360 Or 851 (2017). "In doing so, however, we are bound by the post-conviction court's findings of fact if they are supported by evidence in the record." *Id.* (internal quotation marks omitted).

## I. THE UNDERLYING CRIMES AND PROCEDURAL BACKGROUND

### A. *Petitioner's Crimes and the Guilt Phase of Petitioner's Criminal Trial*

As context for our discussion, we first recount the facts regarding the aggravated murders committed by petitioner and the guilt phase of petitioner's trial, largely drawn from the Supreme Court's opinion in *State v. Running*, 336 Or 545, 87 P3d 661, *cert den*, 543 US 1005 (2004).

Petitioner was romantically involved with one of the victims, Anderson. At some point prior to the murders, it appeared to petitioner that Anderson would end her relationship with petitioner and return to a previous romantic partner, Gilpin.

On the day of the shootings, Anderson and petitioner were at a restaurant. Petitioner left the restaurant, and later Gilpin joined Anderson at the restaurant.

Petitioner returned to the restaurant armed with a shotgun. When petitioner entered the restaurant, he encountered Gilpin and shot her in the abdomen. Petitioner went to another room in the restaurant. Anderson was in that room, and petitioner shot her in the hip at close range. After Anderson fell to the floor, petitioner aimed the gun very close to her cheek and fired, killing her. Petitioner then left the room and walked toward the entrance of the

---

need to address petitioner's other arguments and assignments of error related to the penalty phase of his criminal trial. To the extent petitioner's other arguments and assignments of error related to the penalty phase of his criminal trial implicate his sentence of life without the possibility of parole, we reject those arguments and assignments of error without further discussion.

We also reject without discussion petitioner's assignments of error related to the guilt phase of his criminal trial, and those related to his direct appeal from his criminal trial.

restaurant. As he approached the entrance, he encountered Gilpin's body. Petitioner stopped, kicked the body and, although it appeared that she already had died, placed the gun above Gilpin's ear and shot her again. Petitioner left the restaurant.

Petitioner was arrested and charged with two counts of aggravated murder and one count of being a felon in possession of a firearm.

During petitioner's criminal trial, he did not deny that he had shot Anderson and Gilpin. Instead, his theory of defense was that he lacked the requisite mental state—intent—to support the charge of aggravated murder and that he was under the influence of an extreme emotional disturbance at the time that he killed Anderson and Gilpin.

The jury found petitioner guilty of all three counts.

B.   *The Penalty Phase of Petitioner's Criminal Trial*

The penalty phase of petitioner's criminal trial was governed, in part, by ORS 163.150(1)(b)(B) (1997), which required that the jury, as a prerequisite to the trial court imposing a death sentence, determine "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]"[2] Unless the jury unanimously voted "yes" on that question, a death sentence could not be imposed. ORS 163.150(1)(e), (2)(a) (1997). Accordingly, during the penalty phase of petitioner's trial, the prosecutor sought to convince the jury that there is a probability that the petitioner would commit criminal acts of violence that would constitute a continuing threat to society.

1.   *The prosecutor's opening statement*

During the prosecutor's opening statement, the prosecutor told the jury that "the best predictor of future behavior is past conduct." In the prosecutor's view, "the

---

[2] ORS 163.150 has been amended several times. Or Laws 1999, ch 1055, § 1, Or Laws 2001, ch 306, § 1, Or Laws 2005, ch 480, § 1, Or Laws 2017, ch 359, § 4, Or Laws 2019, ch 635, § 5. It no longer requires that the jury determine whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

circumstances of the [murders themselves], the deliberateness, the calculated nature of the [murders], the brutality of the [murders], that the [petitioner] killed two defenseless, unarmed women by itself shows that the [petitioner] constitutes a continuing threat to society." The prosecutor further told the jury that the murders were not an "aberration in the [petitioner's] conduct," because petitioner "led a life of crime for 35 years," and asserted that the deaths of Gilpin and Anderson "were the predictable result of the [petitioner's] lifetime of criminal and antisocial behavior." The prosecutor told the jury that "more often than not the victims of the [petitioner's] acts of violence were women," a "common theme" of petitioner's criminal conduct "is a complete lack of respect for people in positions of authority," and that, while petitioner was in jail awaiting trial, he "got[] into fights with inmates."

2.   *Petitioner's trial counsel's opening statement*

During petitioner's trial counsel's opening statement, petitioner's trial counsel highlighted that when petitioner was previously in prison he never had any "disciplinary write-up or bad conduct." Additionally, petitioner's trial counsel noted that they intended to call Captain Hepler of the Oregon State Penitentiary (OSP) to testify that OSP is "equipped to handle any individual who acts out, who acts out towards other inmates, [or] who acts out towards other staff," and that OSP "is an appropriate place" for petitioner.

3.   *The state's evidence*

The state's evidence during the penalty of phase included information regarding petitioner's numerous prior criminal convictions, military court martial, and witnesses who testified about petitioner's long history of violent and criminal conduct. Testimony presented by the state reflected, among other facts, that petitioner had stabbed people, pointed a loaded gun at two women who had apparently angered him, masturbated in a car parked in downtown Portland on 30 or more occasions while women walked by, grabbed a female strangers' buttocks and called her derogatory names, threatened to kill a police officer who had arrested him for DUII, and drove a semi-truck while high on methamphetamine.

Petitioner's ex-wife, who was called as a witness, testified (1) that petitioner committed numerous violent acts against her, (2) that when the her daughter was 12-years old, petitioner put a gun to his step daughter's head, and (3) that, after she left petitioner, petitioner got a tattoo depicting a woman's throat being cut by a knife and told her, "See my new tattoo[,] I got this just for you," which she understood to be a threat to kill her. Additionally, petitioner's ex-wife's daughter testified that, when she was a minor, petitioner had "offered" her to strangers for sex, sexually abused her, and threatened to kill her family if anyone found out about his conduct toward her.

As for evidence of petitioner's conduct while jailed for the murders of Anderson and Gilpin but prior to the penalty phase of his criminal trial, petitioner was observed in fistfights with inmates, petitioner told a corrections officer that he would kill the corrections officer if given the opportunity, and petitioner made a sexual comment to a female corrections officer.

4. *Petitioner's evidence*

During the penalty phase of his trial, petitioner called Hepler to support the argument that, if petitioner was sentenced to life in prison, he would not pose a threat to other inmates or corrections officers because inmates at OSP are "well-managed" and OSP has facilities to "deal with incorrigible inmates."

Hepler described what life was like for an inmate in the general prison population at OSP and noted that the general prison population includes some convicted murderers serving life sentences. Hepler also described the special housing units at OSP, one of which is the intensive management unit. That unit is for inmates who have "demonstrated inappropriate behavior for a period of time." In intensive management, an inmate's day-to-day routine is restricted more than prisoners in the general population: inmates exercise in a "cubicle," which does not permit direct sunlight; visits are conducted through a glass partition; and the cells have no windows and the lights in the cells are never turned off, only dimmed at night. Additionally, Hepler

testified that there is an "honor block" for inmates who have had two years of "no major writeups." Cells on the honor block have a solid door and inmates are given a padlock to lock the cell. Hepler also explained the safety precautions that corrections officers at OSP take in an effort to keep inmates and staff safe.

Hepler also testified that after a person is sentenced, in order to determine which prison facility will house the inmate, an assessment is done on the inmate's "psychological needs, education needs, treatment needs, [and] security concerns, which would include past escapes, assaults, threats on law enforcement officers, [and] any gang notifications from other agencies." From that assessment, "a determination [is] made of what they are likely to do in the future based upon their past conduct."

Notwithstanding the safety precautions taken by corrections officers, according to Hepler, inmates have been found in possession of weapons at OSP, drugs have been smuggled into OSP, inmates "often" take advantage of "weaker inmates," and inmates assault other inmates and corrections staff. Hepler believed that prison officials only witness or see the results of around 30 percent of the assaults that occur in prison. Additionally, Hepler remarked that, over the past 20 years, there have been five murders by inmates of other inmates, and, over the history of OSP, inmates have killed eight or nine OSP employees. Hepler also noted that, among inmates, convicted murderers have "greater status" in the prison system.

Hepler testified that, if people serving life sentences have to be removed from the prison, they are an escape risk, because people serving life sentences "don't have anything to lose." He further stated that the "concept of not having anything to lose" applies "within prison walls" as well.

5.  *The state's closing argument*

In its closing argument, the state sought to counter petitioner's theory that he would not pose a threat to other inmates or corrections officers if petitioner was given a sentence of life in prison. The prosecutor emphasized petitioner's "criminal history spanning 35 years peppered with

violence, juvenile, military, adult, criminal conduct that continued even during this trial, peppered with violence, serious assaults, knife attacks, sudden, unpredictable outbursts of violence in response to little or no provocation whatsoever." In particular, the prosecutor noted that petitioner abused his ex-wife and ex-wife's daughter. The prosecutor contended that, given the "compelling and believable evidence, your answer to the \*\*\* question [of] whether it is more likely than not that this defendant would commit acts of violence that would constitute [a] continuing threat to society must be yes."

6.   *Petitioner's trial counsel's closing argument*

In closing argument, petitioner's trial counsel argued that Captain Hepler's testimony demonstrated that the penitentiary could "handle" petitioner, that there was "no evidence from the state of Oregon that [petitioner] cannot be controlled by [corrections officers] who watch him constantly," and that petitioner "disrespecting" corrections officers while he was in jail was not a reason to kill him. Petitioner's trial counsel further argued that penitentiary employees are capable of preventing escapes and that there was no evidence that petitioner had been found with a weapon while in jail.

Trial counsel further argued that the state did not prove that petitioner is a continuing threat to society because no "experts" testified, and no lay person testified that they feared petitioner.

7.   *The state's rebuttal argument*

Finally, during the state's rebuttal argument, the prosecutor argued that "[t]he evidence presented in this case proves that [petitioner] is an evil, cruel, unrepentant, double murderer who is extremely dangerous and who has promised to kill again." In response to petitioner's comment about the absence of expert witnesses, the state argued that "you don't need any professionals" because "common sense tells you that people make this type of decision every day" and reiterated his view that "the circumstances of the murders" show that petitioner "poses a serious risk to society and will pose that risk for the remainder of his life," and

that petitioner's history of criminal conduct demonstrates the murders were not an aberration.

The prosecutor also argued that, even in jail, petitioner continued to commit "acts of violence and threatened officers knowing that it would be used against him in the penalty phase in the case," so "[o]ne can only reasonably assume that his behavior will get worse once he's in prison and has nothing to lose."

The prosecutor added that, although petitioner's trial counsel suggested that petitioner was "not a problem" the last time he was in prison, petitioner's prior stint in prison was "less than 10 months," and that the staff at the penitentiary would not be able to control petitioner's behavior because, if petitioner "receives anything less than a death sentence, he will be housed in general population for 15 hours a day" and "be able to obtain weapons."

### 8. *The jury's verdict*

At the conclusion of the penalty phase of petitioner's trial, the jury determined that petitioner should be sentenced to death for the murder of Anderson and to life imprisonment without the possibility of parole for the murder of Gilpin. The trial court sentenced petitioner in accordance with the jury's determinations.

### C. *The Post-Conviction Proceeding*

As noted above, petitioner alleged that his trial counsel rendered inadequate and ineffective assistance because they failed to retain an expert and present expert testimony during the penalty phase of petitioner's trial on the topic of petitioner's "future dangerousness."

To support that claim, petitioner presented evidence from a forensic psychologist, Dr. Thomas J. Reidy, who, after review of documents and other materials, formed an opinion that petitioner posed a "relatively low" risk or probability of "serious violence" in prison. "Serious violence" includes things like "broken bones, or causing concussions or hospitalizations," and is different from "mild violence," which includes such things as "fistfights," which, Reidy acknowledged are more common in prisons. We summarize

some of the salient points from Reidy's testimony and declaration.

Reidy explained the group statistical concept of "base rate"—which is the "statistical prevalence of a particular behavior in a given group over a period of time"— and explained that many base rates are "counter-intuitive." More specifically, "base rates of serious institutional violence among former death row inmates, incarcerated murderers, long-term inmates, and federal high security prisoners are relatively low, and in some samples are *below* those of inmates convicted of less serious offenses." Further, Reidy explained that research refutes the idea that inmates serving life-without-parole sentences are likely to behave violently because they have "nothing to lose." In Reidy's view, "research suggests that [petitioner] as a long-term inmate would have a lower likelihood of disciplinary difficulties, despite the seriousness of his crime" because "the reality of * * * inmate management * * * is that there is always something to be gained by behaving, which is a reality that is not lost on long-term inmates who recognize that they will spend much if not all of their lives in prison."

Reidy also explained that "[c]ontext is a critically important variable in assessing the likelihood of violence" and, therefore, it "cannot be reliably assumed that behavior in the community will be observed in prison." He also explained that the "well-known maxim" that "the best predictor of future behavior is past behavior" is only true "up to a point." That is, according to Reidy, "behavior can reliably estimate future behavior, but only when the pattern is sufficiently established and the predicted context is sufficiently similar."

Reidy explained the context in which petitioner committed his criminal conduct is different from prison: petitioner's "capital offense was against defenseless females using overwhelming firepower[,]" but that most other "inmates are of equal or greater stature than petitioner and have equivalent access to weapons," and correctional officers "in prison are trained in the physical application of force" and generally "have rapid backup by other officers"; much of petitioner's prior violence was "associated with his

relationships," but "[w]hile imprisoned [petitioner] would not have access to a female for a romantic or sexual relationship, and thus this context of risk would not be replicated in prison"; and much of petitioner's prior violence was associated with "substance abuse," and that alcohol and drugs are harder to come by in prison than they are outside of prison. According to Reidy, "[p]rison violence does not predictably follow from pre-confinement criminal and violent behavior."

Further, Reidy explained that misconduct in jail is not necessarily indicative of prison behavior. In Reidy's view, "relying sole[ly] on the patterns of behavior in jail to predict future prison violence reflect a confirmatory bias," and "ignor[es] or giv[es] little attention to situational, interpersonal, or contextual factors differentiating jail and prison." Further, in Reidy's view, "[t]hreats, mutual fistfights, and disruptive or disrespectful behavior in jail *** are not strongly predictive of prison violence and can be managed as [a] general rule by methods available to prison staff, including medication, incentives, and specialized housing."

During cross-examination, Reidy acknowledged, among other points, that the data he relied on in forming his opinions did "not account for unreported prison violence."

After the close of evidence and argument in the post-conviction proceeding, the post-conviction court determined that "failure by trial counsel to call an expert in the penalty phase on the issues of future dangerousness and mitigation [are] inexcusable under the circumstances of this case and this failure falls below the acceptable standard of conduct for trial counsel in the penalty phase of a death-penalty case." The post-conviction court observed that "this case revolved around the penalty phase and competent trial counsel should have known this from the outset of the case" because "the evidence of guilt against petitioner was overwhelming."

The post-conviction court then turned to what it described as the "close and difficult" issue of whether petitioner had proven by a "preponderance" that he was prejudiced by his trial counsel's deficient performance, and ultimately determined that it could only "find from the evidence that it is a 'possibility' that the expert testimony would have

affected the outcome of the penalty phase" and, therefore, petitioner did not suffer prejudice. It also noted "additional evidence might have helped petitioner in the penalty phase, but as the [superintendent] argues, it might have actually hurt the petitioner."

## II.  ANALYSIS

Under Article I, section 11, of the Oregon Constitution, "[i]n all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel." The right to counsel calls "for an adequate performance by counsel of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf." *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981).

To establish that his trial counsel rendered inadequate assistance, "petitioner was required to prove two elements: (1) a performance element—that trial counsel failed to exercise reasonable professional skill and judgment; and (2) a prejudice element—that petitioner suffered prejudice as a result of counsel's inadequacy." *McMillan v. Kelly*, 304 Or App 299, 314, 467 P3d 791 (2020) (internal quotation marks omitted).

In this case, the superintendent does not contest the post-conviction court's determination that petitioner's trial counsel's failure to present expert evidence in the penalty phase constituted deficient performance.

Turning to prejudice, "The existence of prejudice is a legal question that may be dependent on predicate facts." *Stomps v. Persson*, 305 Or App 47, 55, 469 P3d 218 (2020). "To establish prejudice of state constitutional magnitude, the petitioner must show that counsel's advice, acts, or omissions had a tendency to affect the result of the prosecution." *Id.* at 55-56. The Supreme Court explained in *Green v. Franke*, 357 Or 301, 322-23, 350 P3d 188 (2015), that the "tendency to affect" standard requires petitioners to show "more than mere possibility, but less than probability" of an effect. As we recently noted in *Stomps*, 305 Or App at 56,

"[t]he issue is whether trial counsel's acts or omissions 'could have tended to affect' the outcome of the case. That

is, a petitioner must show more than it is possible that the outcome of the prosecution would have been different if counsel had performed reasonably, but need not show that it is more likely than not that the outcome would have changed."

In this case, we conclude that petitioner has met his burden of showing "more than mere possibility" that the outcome of the penalty phase of his criminal trial would have been different if his trial counsel had called an expert in the penalty phase on the issue of future dangerousness. That is, there was "more than mere possibility" that petitioner would not have been sentenced to death if trial counsel had called an expert in the penalty phase of his criminal trial on the issue of future dangerousness.

During the penalty phase of petitioner's criminal trial, the prosecutor's central argument to the jury regarding future dangerousness was that petitioner would commit criminal acts of violence that would constitute a continuing threat to society because "the best predictor of future behavior is past conduct." That argument found support in Hepler's testimony that, during an initial intake of new inmates, "a determination [is] made of what they are likely to do in the future based upon their past conduct." But, had petitioner's trial counsel called an expert in the penalty phase on the issue of future dangerousness, *e.g.*, Reidy, the expert could have explained the importance of "context" in assessing "the likelihood of violence," and that it "cannot be reliably assumed that behavior in the community will be observed in prison" because the context is different. If credited by the jury, that testimony would have rebutted a central argument made by the prosecutor as to future dangerousness, and, at the very least, would have given petitioner's trial counsel a better basis to argue that the central premise of the prosecutor's case for petitioner's future dangerousness was flawed. *See Richardson v. Belleque*, 362 Or 236, 266-67, 406 P3d 1074 (2017) (failure to obtain records and consult with an expert at a dangerous-offender sentencing hearing was prejudicial under Article I, section 11, where information obtained could have provided additional "ammunition" at that hearing to oppose an enhanced sentence, either through calling an expert to the stand, through cross-examination, or both).

Petitioner's trial counsel calling an expert on the issue of future dangerousness during the penalty phase of petitioner's trial also would have assisted petitioner's trial counsel in addressing other aspects of the prosecutor's future dangerousness argument. As noted above, the prosecutor argued that, even in jail, petitioner continued to commit "acts of violence and threatened officers knowing that it would be used against him in the penalty phase in the case" and "[o]ne can only reasonably assume that [petitioner's] behavior will get worse once he's in prison and has nothing to lose." That argument was buttressed by Hepler's testimony—*viz*., that the "concept" that inmates serving life sentences do "not hav[e] anything to lose" applies "within prison walls." Had trial counsel called an expert in the penalty phase on the issue of future dangerousness, the expert could have presented evidence to the jury indicating that misconduct in jail is not necessarily indicative of prison behavior and presented evidence that, if credited by a juror, would have demonstrated the prosecutor's "nothing to lose" argument was specious because "research suggests that [petitioner] as a long-term inmate would have a lower likelihood of disciplinary difficulties, despite the seriousness of his crime."

On appeal, the superintendent points to what it views as various difficulties with the evidence elicited from Reidy during the post-conviction proceeding and argues that Reidy's "proffered testimony regarding future-dangerousness could not have had a tendency to affect the result."

First, the superintendent argues that "Reidy's proposed testimony was limited to the likelihood *** a convicted murderer would later commit acts of so-called 'serious violence,' *** defined as assaults resulting in broken bones, burns, etc.," and did not assess "the likelihood that such an inmate would engage in what [Riedy] dismissed as 'mild violence,' such as 'fistfights.'" In the superintendent's view, because "criminal acts of violence," as that phrase was used in ORS 163.150(1)(b)(B), is not limited to "those acts that are likely to result in physical injury to persons," but "encompasses a broad a range of possible future acts of criminal violence, as those words are commonly understood," Reidy's

"entire analytical paradigm \* \* \* did not actually speak to the future-dangerousness analysis under Oregon law."

The superintendent is perhaps right that some of Reidy's analysis addressed a narrower subset of violent acts than those that were contemplated by ORS 163.150(1)(b)(B) (1997). *See State v. Tucker*, 315 Or 321, 336-37, 845 P2d 904 (1993) (rejecting argument that the term "criminal acts of violence," as that phrase was used in ORS 163.150(1)(b)(B), referred to a "relatively narrow" range of conduct likely to result in physical injury to persons, "including homicide, forcible rape, aggravated assault, and arson"). For example, Reidy's opinion that petitioner posed a "relatively low" risk or probability of "serious violence" in prison, and he examined "base rates" of "serious institutional violence." But, in the end, that does not affect our analysis in this case because we disagree with the superintendent that all of the information presented by Reidy at the post-conviction proceeding was so limited, and that, if credited by a jury during petitioner's criminal trial, there was not "more than mere possibility" that it would have been beneficial to petitioner when the jury was assessing petitioner's future dangerousness. *Green*, 357 Or at 322. As noted above, given the prosecutor's central argument that "the best predictor of future behavior is past conduct," evidence regarding the limitations of that maxim when context differs—*i.e.*, when a person is in prison versus in the community—would have "laid better groundwork for arguing" against the death penalty. *Johnson v. Premo*, 361 Or 688, 707-08, 710-11, 399 P3d 431 (2017) (the petitioner was prejudiced by trial counsel's deficient performance in choosing a defense at trial where, among other things, an alternative defense would have allowed trial counsel to argue for guilt on a lesser offense that did not carry the death penalty and also "would have laid better groundwork for arguing in the penalty phase that the jury should not impose a sentence of death"). Further, as described above, testimony from an expert on the topic of future dangerousness could have assisted petitioner's trial counsel in arguing that the prosecutor's supposition that "one can only reasonably assume that [petitioner's] behavior will get worse once he's in prison and has nothing to lose" was not necessarily grounded in fact.

Next, the superintendent argues that Reidy's "statistical analysis is premised on unrealistic assumptions about the frequency that violent acts occur in prison" because "it is based only on *reports* of such acts over a short period of time rather than on any hard data of the actual occurrence over an indefinite period of time" and that "although it may be true that murderers *as a class* tend not to violently act out in prison, that generality may not be true for a murderer who, like petitioner, (1) had a long, continuous previous history of committing criminal acts of violence, and (2) who committed deliberate, public, horrific, gratuitously violent murders of defenseless victims." In the superintendent's view, jurors "likely would find [Reidy's] 'statistics' as proving nothing of significance about the probability that *petitioner* would continue to commit crimes of violence." (Emphasis in the superintendent's brief.)

We disagree with the superintendent. The evidence adduced by post-conviction counsel through Reidy would have been pertinent to a juror's assessment of how much weight to give the state's penalty-phase evidence—in particular, the state's evidence regarding petitioner's prior violent criminal conduct. Although Reidy's testimony was not "conclusive" regarding petitioner's future dangerousness, and any expert called as a witness by petitioner's trial counsel would have been subject to thorough cross-examination about the limitations of statistical analysis in predicting future dangerousness in prison, for the reasons described above, there was "more than mere possibility" that the outcome of the penalty phase of petitioner's criminal trial would have been different if his trial counsel presented expert testimony on the subject of future dangerousness. *Lichau v. Baldwin*, 333 Or 350, 364, 39 P3d 851 (2002) ("[E]vidence presented at a post-conviction hearing—evidence that could have been presented at petitioner's criminal trial" need not be "'conclusive' to be deemed to have a tendency to affect the result of a trial.").

Finally, the superintendent argues that "any analysis of prejudice also has to take into consideration whether the omitted evidence might have had a detrimental effect on the jury's view of the [petitioner]" and contends that the post-conviction court was entitled to "conclude[] that this

additional evidence might have helped petitioner in the penalty phase, but as the [the superintendent] argues, it might have actually hurt the petitioner." Without pointing to any specific aspect of the information presented by Reidy during the post-conviction proceeding regarding future dangerousness, the superintendent contends that expert testimony on the issue of petitioner's future dangerousness would have aided the state's case because it would have "established petitioner's singular dangerousness." To the extent that the superintendent's argument is premised on the above-described possible grounds for challenging Reidy's proffered testimony—*e.g.*, petitioner's long history of committing criminal acts of violence and the specific conduct that led to his aggravated murder convictions—the jury had already been apprised of that information. To the extent that the superintendent is describing some other related grounds regarding Reidy's future dangerousness assessment, the superintendent does not identify those related grounds or make an argument as to how the jury learning of them would have been detrimental to petitioner, and therefore the superintendent's argument on appeal is insufficiently developed for us to address it. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) (it is not "our proper function to make or develop a party's argument when that party has not endeavored to do so itself").[3]

In sum, we conclude that petitioner has met his burden of showing that, given the particular facts of this case, there was "more than mere possibility" that the outcome of the penalty phase of his criminal trial would have been different if his trial counsel had called an expert in the penalty phase on the issue of future dangerousness. That is, there

---

[3] The superintendent also argues that the "proffered new evidence was merely cumulative—packaged differently, to be sure, but merely cumulative—of what already was presented to the jury and that the jury rejected." Although some of the information offered by Reidy during the post-conviction proceeding was raised during petitioner's criminal trial—such as that there are incentives to comply with prison rules (*e.g.*, the "honor block") and specialized housing can be used for inmates who do not comply with prison rules (*e.g.*, "intensive management")—much of the information presented by Reidy during the post-conviction proceeding was not cumulative of evidence presented during petitioner's criminal trial, and we therefore reject that argument without further discussion.

was "more than mere possibility" that petitioner would not have been sentenced to death if trial counsel had called an expert in the penalty phase of his criminal trial on the issue of future dangerousness.

Reversed and remanded with instructions to grant petitioner relief by vacating the sentence of death; otherwise affirmed.