Argued and submitted October 22, 2018, affirmed July 1, 2020

HAZELYNN K. STOMPS,
*Petitioner-Appellant,*

*v.*

Rob PERSSON,
Superintendent,
Coffee Creek Correctional Facility,
*Defendant-Respondent.*

Washington County Circuit Court
C146351CV; A164247

469 P3d 218

Petitioner appeals a judgment rejecting her claims for post-conviction relief after her conviction for murder. She asserts that trial counsel who represented her at a hearing on a motion to suppress evidence that the police had obtained from a search of petitioner's house and property was inadequate and ineffective in failing to present evidence in support of counsel's theory that petitioner had been unable to give consent to the search. *Held*: Counsel exercised reasonable professional skill in calling an expert witness to provide an opinion as to the effects of medications on petitioner's ability to consent, and counsel's failure to obtain the desired testimony from that witness or through other means did not constitute inadequate assistance. But even assuming that counsel was inadequate in failing to seek other testimony, petitioner has not shown that obtaining that testimony would have changed the trial court's ruling on the motion to suppress, which was necessary to establish prejudice.

Affirmed.

Dale Penn, Senior Judge.

Lindsey Burrows argued the cause for appellant. Also on the briefs was O'Connor Weber LLC.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

ARMSTRONG, P. J.

Affirmed.

**ARMSTRONG, P. J.**

Petitioner appeals a judgment rejecting her claims for post-conviction relief after her conviction for murder. She asserts that trial counsel who represented her at a hearing on her motion to suppress evidence obtained from a search of her house and property was inadequate and ineffective in failing to present evidence in support of counsel's theory that petitioner had been unable to give consent to the search.[1] We conclude that counsel was not inadequate or ineffective and therefore affirm.

We review the post-conviction court's legal conclusions for legal error and are bound by its findings of fact if they are supported by evidence in the record. *Green v. Franke*, 357 Or 301, 312, 350 P3d 188 (2015); *Montez v. Czerniak*, 355 Or 1, 8, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014). We summarize the relevant facts as reflected in the record and in the post-conviction court's explicit and implicit findings, which we conclude are supported by evidence in the record.

Early on the morning of February 6, 2009, in a rural area of Multnomah County near the Gordon Creek Bridge in the Columbia Gorge, petitioner waved from the side of the road to a passing vehicle for help. Men in the vehicle found petitioner on the ground, injured and unable to walk. Sheriff's deputies responded to the scene. Petitioner told the officers that she and her husband had come to the river to meet a man named Dave, who was interested in purchasing their boat. Petitioner told officers that they were attacked by Dave and another assailant, that she thought her husband had been abducted by Dave, and that she had been thrown from a bridge by the other assailant.

Petitioner was hospitalized for treatment of pelvic and rib fractures while law enforcement officers searched for her husband and conducted an investigation. Over the next week, officers interviewed petitioner several times. At 10:00 a.m. on February 6, 2009, the day that she was admitted to the hospital, Multnomah County Sheriff Sergeant

---

[1] She further asserts that trial counsel was inadequate and ineffective in failing to object to testimony that she contends constituted improper vouching. We reject that argument without discussion.

Kubic and another officer interviewed petitioner. Petitioner was in pain but alert and coherent. A nurse asked officers to leave so that petitioner could be prepared for a procedure. The officers obtained petitioner's verbal consent to search the couple's residence and property for evidence of criminal activity directed at the couple.

A cursory search of the property did not result in the discovery of incriminating evidence. Officers returned to the hospital on February 6 at 8:30 p.m. to continue interviewing petitioner. Petitioner was coherent but obviously under the effects of medication and would nod off and then regain consciousness.

The following day, February 7, 2009, petitioner's medical chart includes a note that at 7:30 a.m., petitioner's "mental status was essentially normal[,] *** her speech was clear and [she] followed commands." Officers returned to the hospital that morning at 11:00 a.m., to request petitioner's consent for a more thorough search of the property, which consisted of approximately 60 acres. The nurse who admitted the officers to petitioner's room told them that petitioner was lucid. The officers testified that petitioner was alert and in better shape than the previous night. She engaged in conversation with them, and they requested permission to do a more thorough search of the property. Petitioner initially hesitated and expressed concern that her husband might not approve. But after talking on the telephone to her husband's brother, petitioner gave written consent to the deputies for a more thorough search of her house and property.

In the search of petitioner's property, police discovered a metal trash can that contained burned human remains. The police also found a revolver from which two rounds had been discharged and on which police later discovered blood. Petitioner was charged on February 12 with her husband's murder.

Petitioner sought to suppress the evidence found as a result of the February 7 search, contending that, because of medications administered at the hospital, she was cognitively impaired and unable to give consent to the search. *See State v. Larson*, 141 Or App 186, 198, 917 P2d 519, *rev den*, 324 Or 229 (1996) (among factors to consider in determining

the voluntariness of a consent to search is whether drug or alcohol use has impaired the defendant's ability to make a knowing, voluntary, and intelligent choice). At the suppression hearing, petitioner's counsel called Dr. Izenberg, a trauma surgeon and attending physician. Izenberg had admitted petitioner to the hospital and had performed two procedures on petitioner while she was there—a procedure on February 6 and a pelvic surgery on February 9. Counsel testified at the post-conviction hearing that, after telephone conferences with Izenberg, she decided to call him as a witness. Counsel testified that Izenberg came off on the telephone as dynamic, and she thought that he would be the perfect witness because he had treated petitioner, he had excellent credentials, and he had a previous positive relationship with an investigator in counsel's office. Additionally, Izenberg had experience with pharmaceuticals and a criminal-justice background. Counsel believed that Izenberg could testify as to facts but could also give an expert opinion as to the effects of the drugs that petitioner was taking at the time that she gave her consent. Counsel did not expect Izenberg to be able to testify as to whether the medications had, in fact, affected petitioner, but she thought that he could describe their possible side effects. Counsel did not request funding for Izenberg as an expert.

Shortly before the hearing, counsel learned that Izenberg was not happy that he would not be paid an expert-witness fee. Counsel tried at the last minute to obtain a fee for him but was unable to do so.

Thus, Izenberg was a challenging witness. However, after the trial court's encouragement and in response to counsel's questions, Izenberg described petitioner's medications and their general effects.[2] Izenberg testified from

---

[2] Izenberg initially refused to answer counsel's question about the possible side effects of Fentanyl, stating that was not a "simple fact question." The court intervened at that point, noting that the questions were "getting into an area of expert testimony." The court directed that counsel limit questions "to observations by this witness related to this particular case and circumstances and not general [effects]." But the court encouraged Izenberg to cooperate with the questioning:

"Okay. Dr. Izenberg, you've been subpoenaed to be a fact witness in this case. You happen to be a doctor, too. And so we're in a gray area here. You're not being subpoenaed to be an expert witness, but I think the way your time is going to be minimized, which I know is your goal here, is to just get through this."

petitioner's medical record, which was received as an exhibit at the post-conviction hearing. He testified that he had not personally administered medications to petitioner on February 7, the day that she consented to the search, but he described in detail the medications that she had received and their general effects. He explained that some of the medications were opiates that could have "variable" sedative effects.

Izenberg testified that the medical record for February 7 includes a nurse's note at 7:30 a.m. that petitioner's "mental status was essentially normal[,] *** her speech was clear and [she] followed commands." Izenberg testified that the medications he ordered that day were given intravenously at low doses to control their effects, and were short acting:

> "We gave these for pain medication. We gave them in low doses. We gave them in the IV route, so they were quickly metabolized and wore off. And that's how we give the medications."

The medical record shows that, on the morning of February 7, petitioner received an intravenous dose of valium at 8:00 a.m. and an intravenous dose of morphine at 9:00 a.m. Izenberg testified that the dose of valium that petitioner received would not last longer than 90 minutes (9:30 a.m.) and that the dose of morphine that petitioner received would wear off in 20 to 30 minutes or as long as 45 minutes (9:45 a.m.). Petitioner signed the consent to search at 11:00 a.m. Thus, Izenberg's testimony supported a finding that, when she signed the consent to search at 11:00 a.m., petitioner was no longer under the effects of the two medications that she had received two and three hours before. Other witnesses testified that, on the morning that she gave her consent to the search, petitioner was lucid, alert, and eager to talk to the officers and remain informed about the search for her husband.

The trial court considered all of the factors relevant to a determination whether a person's consent to search is voluntary, *see State v. Stevens*, 286 Or App 306, 399 P3d 1053 (2017), *rev'd on other grounds*, 364 Or 91, 430 P3d 1059 (2018) ("whether physical force was used or threatened";

"whether weapons were displayed"; "whether the consent was obtained in public"; "whether the person who g[ave] consent [was] the subject of an investigation"; "the number of officers present"; "whether the atmosphere surrounding the consent [was] antagonistic or oppressive"; and whether drug use impaired the defendant's "capacity to make a knowing, voluntary, and intelligent choice." (citing *Larson*, 141 Or App at 198)), and found that, with the exception of the possible effects of medication, all the factors militated in favor of a conclusion that the consent was voluntary. As to the effects of medication, the court found that petitioner had been given "mild" amounts of morphine, valium, and other drugs during her hospitalization as necessary for her treatment and pain. The court cited Izenberg's testimony that the drugs' effects would have been "mild," based on both the "nature of the drugs and the amounts given." The court found that on the morning of February 7, petitioner was "lucid and alert," that police officers thoroughly discussed the purpose of their search with petitioner on the morning of February 7, and that petitioner had talked with one of the officers on the telephone while the search was underway, in a cooperative and helpful manner. In light of those findings, the court concluded that petitioner's consent was voluntary, and the court denied the suppression motion.

Petitioner was ultimately convicted of her husband's murder. She filed a petition for post-conviction relief, contending in her first claim:

> "[Counsel] failed to consult and call an expert to testify at petitioner's motion to suppress hearing regarding the effects of petitioner's medications on her ability to consent to the search of her house."

Petitioner argued that, because Izenberg had not given an opinion concerning the effect of medications on petitioner's cognitive ability to give consent, counsel had failed to call an expert to give testimony regarding her ability to give consent.[3] Petitioner offered the declaration of Dr. Julian, a

---

[3] Petitioner's post-conviction counsel argued:

"However he was initially, he had become combative and shown he was not going to be a cooperative expert witness. And to blithely [go] into a motion to suppress hearing knowing that you have to show this person could not

psychopharmacologist who is now retired and unlicensed, as the type of testimony that counsel should have presented to support her motion. Julian, who had reviewed petitioner's medical records, did not address dosages or the timing of medications but opined that petitioner "may have been under the influence of medications that may have affected her mental clarity and her ability to fully comprehend the significance of what she is agreeing to," and that petitioner's cognitive abilities were "likely compromised" when she gave consent to search her property.

Petitioner's counsel testified on behalf of respondent at the post-conviction hearing and provided two affidavits about her recollections. She stated in her affidavit and testimony that she chose to call Izenberg as an expert in support of the suppression motion because she was familiar with him and believed, after prehearing conversations, that he was well-qualified and that, as petitioner's admitting physician, he could testify about the medications that petitioner had been given and the effects that they could have on petitioner's mental state. Counsel testified that Izenberg was "hyper-qualified, well educated." Counsel testified that she thought that, with Izenberg, she was getting an "expert plus," and that, although he would be called as a fact witness as petitioner's treating doctor, he could also give expert testimony regarding the effects of her medications. Counsel stated in her affidavit that it was only very shortly before the hearing that she learned that Izenberg was reluctant to testify because he would not be receiving an expert-witness fee. She tried but failed to obtain last minute approval for compensation for Izenberg equivalent to an expert-witness

---

consent without any expert witness to talk about that, to talk about what the standards are or how morphine acts on a person is inadequate assistance."

And again:

"[Counsel] argued in the motion to suppress that [petitioner] couldn't consent. She went into the motion to suppress hearing unprepared, without a witness who could and would testify to that fact. There were two people who did, the two detectives who were in the room. Not a nurse who said she was lucid at some point before and told one of the detectives—two detectives. They said she was with it. They provided that information in their police reports.

"In order to contradict that, she needed to have a witness to talk about the effects of those medications two hours after they were given when [petitioner] signed the consent."

fee. She decided to question Izenberg as best she could to elicit information that might bear on petitioner's ability to give consent, and she felt that he begrudgingly gave her the information she needed.

Under Article I, section 11, of the Oregon Constitution, "in all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel." The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." Although those provisions are worded differently, they "embody similar objectives." *Krummacher v. Gierloff*, 290 Or 867, 871, 627 P2d 458 (1981). The right to counsel is the right to effective counsel. *Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984); *Krummacher*, 290 Or at 872 (The right to counsel calls "for an adequate performance by counsel of those functions of professional assistance which an accused person relied upon counsel to perform on his behalf.").

Under Article I, section 11, a petitioner seeking post-conviction relief based on inadequate or ineffective assistance of counsel must demonstrate by a preponderance of the evidence that counsel failed to exercise reasonable professional skill and judgment, *Green*, 357 Or at 312, and that the petitioner suffered prejudice as a result. *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002); *see also Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991) ("The burden is on petitioner to show, by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result."); ORS 138.620(2) ("The burden of proof of facts alleged in the petition shall be upon the petitioner to establish such facts by a preponderance of the evidence."). Under the Sixth Amendment, the petitioner must establish that counsel's representation fell below an objective standard of reasonableness, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694; *Montez*, 355 Or at 7-8. The standards for determining adequacy of counsel under the state and federal constitutions are functionally equivalent.

*State v. Davis*, 345 Or 551, 579, 201 P3d 185 (2008) (equating "effective" assistance with "adequate" assistance).

Whether counsel rendered deficient performance is a legal question. *Simpson v. Coursey*, 224 Or App 145, 153-54, 197 P3d 68 (2008), *rev den*, 346 Or 184 (2009). To prevail on the performance prong of the claim under Article I, section 11, the petitioner must prove, by a preponderance of the evidence, facts demonstrating that counsel failed to exercise reasonable professional skill and judgment. *Trujillo*, 312 Or at 435. To prevail under the United States Constitution, the petitioner must prove that trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms." *Strickland*, 466 US at 694.

The legal standard for reviewing counsel's performance is a deferential one. The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Kimmelman v. Morrison*, 477 US 365, 381, 106 S Ct 2574, 91 L Ed 2d 305 (1986); *Johnson v. Premo*, 361 Or 688, 700, 399 P3d 431 (2017) (in evaluating counsel's performance, the court views the conduct without the distorting effect of hindsight). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 US at 689. In reviewing a post-conviction claim of ineffective assistance of counsel, the court "will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment." *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823, *adh'd to as modified*, 188 Or App 289, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004) (citing *Krummacher v. Gierloff*, 290 Or at 875). Adequacy of assistance of counsel allows for tactical choices that backfire, because, by their nature, trials often involve risk. *Krummacher*, 290 Or at 875.

The existence of prejudice is a legal question that may be dependent on predicate facts. *Ashley v. Hoyt*, 139 Or App 385, 395 n 8, 912 P2d 393 (1996). To establish prejudice of state constitutional magnitude, the petitioner must show

that counsel's advice, acts, or omissions had a tendency to affect the result of the prosecution. *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995). The Supreme Court explained in *Green*, 357 Or at 322-23, that the "tendency to affect" standard requires petitioners to show "more than mere possibility, but less than probability" of an effect. The issue is whether trial counsel's acts or omissions "could have tended to affect" the outcome of the case. That is, a petitioner must show more than it is possible that the outcome of the prosecution would have been different if counsel had performed reasonably, but need not show that it is more likely than not that the outcome would have changed.

Under the federal constitution, prejudice is established by showing that there is a reasonable probability that, but for counsel's deficient performance, the result would have been different. *Strickland*, 466 US at 694 (petitioner seeking post-conviction relief must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," with "reasonable probability" defined as "a probability sufficient to undermine confidence in the outcome").

The post-conviction court rejected petitioner's claim that counsel had performed inadequately in failing to consult or call an expert who could offer an opinion concerning the effects of petitioner's medications, finding that Izenberg "was an expert witness who just didn't get paid as an expert witness and that was a problem for him." The post-conviction court found credible counsel's explanation that she thought that Izenberg would be a strong witness and that she was surprised when Izenberg proved not to be cooperative on the stand. The court reasoned that counsel's decision to call Izenberg had to be evaluated as of the time that the decision was made, *see Johnson*, 361 Or at 700 (in evaluating counsel's performance, the court views the conduct without the distorting effect of hindsight), and the fact that Izenberg did not provide the testimony that counsel had hoped to obtain from him did not mean that the decision to call him was a flawed one. Izenberg, the post-conviction court found, would have been called as a witness by the state if not by petitioner. The court determined that counsel had demonstrated reasonable professional judgment in calling Izenberg as a witness.

Addressing prejudice, the post-conviction court discussed petitioner's contention that Julien could have offered an opinion that petitioner was still under the influence of medications at the time of her consent and that his opinion would have changed the result of the trial court's ruling on the suppression motion. The court did not think that Julien's opinion had established prejudice. The court found that those who were in the room with petitioner, those who treated her, and those who prescribed her medications were the ones "that have the information." The court concluded that Julien, who was not licensed and had not treated petitioner, "cannot give any real opinion." Further, the court explained, Julien's opinion regarding the potential effects of medications lacked a "standard" to guide the court in its determination whether petitioner's ability to consent was impaired by the medications. The court concluded that Julien's opinion would not "in any way" have changed the trial court's ruling on the suppression motion. Thus, the post-conviction court concluded, petitioner had not met her burden to show prejudice.

On appeal, petitioner makes this assignment of error:

"The trial court erred by denying petitioner relief on her claim that her trial attorney was ineffective and inadequate *for failing to present expert testimony regarding the effects of the medications* on her ability to provide knowing, intelligent, and voluntary consent to search her home."

(Emphasis added.) In the face of Izenberg's recalcitrance and failure to provide an opinion that was consistent with the theory of the motion to suppress, petitioner contends that reasonable counsel would have done more to pursue an opinion that petitioner was unable to give consent. Petitioner contends that, "[o]nce an attorney elects a trial strategy, the attorney must execute it in a reasonable fashion to provide effective assistance." She asserts that counsel, having chosen to assert that petitioner's consent to search was invalid because she lacked the ability to give consent, had a duty to follow through with that strategy and secure testimony consistent with that theory. She contends that the success of petitioner's theory depended on evidence regarding the

effects of the medications on petitioner at the time of the consent. Petitioner contends that, when Izenberg failed to provide the desired opinion that the medications had affected petitioner's cognitive functioning at the time of the consent, counsel had a duty to find another way to present that evidence, either by impeaching Izenberg with his prior statements, seeking a continuance to provide him with an expert-witness fee, or calling a different witness who would provide the desired opinion.[4]

We reject petitioner's contention. First, contrary to petitioner's contention, whether petitioner provided knowing, intelligent, and voluntary consent was a legal question that was not subject to expert testimony. *State v. Unger*, 356 Or 59, 79-80, 333 P3d 1009 (2014) (whether defendant voluntarily consented to a search is a legal determination, to be made by a court, based on the totality of circumstances). Second, for the reasons given by the post-conviction court, the evidence in the record supports the post-conviction court's findings and its conclusion that counsel exercised reasonable professional judgment in calling Izenberg to give an opinion as to the effects of medication on petitioner's cognitive ability to give consent.

Counsel testified that her goal in calling Izenberg was for him to describe the effects of petitioner's medications, and he did that. Izenberg testified, essentially, that the medications petitioner received had potentially mild sedative effects. His testimony, along with the medical record, shows that those sedative effects would likely have worn off by the time that petitioner consented to the search at 11:00 a.m. on February 7. Petitioner contends, in essence, that, when Izenberg did not testify that petitioner could

---

[4] Preservation principles apply in the context of post-conviction relief. Arguments that are not encompassed within the claims of the petition will not be considered on appeal. *Hale v. Belleque*, 255 Or App 653, 660, 298 P3d 596, *adh'd to on recons*, 258 Or App 587, 312 P3d 533, *rev den*, 354 Or 597 (2013). The state asserts that petitioner's current argument on appeal—that counsel should have done more to obtain favorable testimony—is different from the argument raised below—that counsel was inadequate in failing to consult and call an expert regarding the effects of petitioner's medication—and is therefore unpreserved. We conclude that, although there is a difference in emphasis, the essence of the argument is the same—that counsel was inadequate in failing to present evidence in support of her theory that, as a result of the effects of medication, petitioner was cognitively unable to consent to the search.

have been cognitively impaired when she gave her consent, counsel should have figured out a different way to obtain that testimony. Because counsel exercised reasonable professional skill in calling Izenberg to provide an opinion as to the effects of medications on petitioner's ability to consent, we reject petitioner's contention that her failure to obtain the desired testimony through other means constituted inadequate assistance. *See Krummacher*, 290 Or at 875 (adequacy of assistance of counsel allows for tactical choices that backfire, because, by their nature, trials often involve risk).

But even if we were to conclude that counsel was inadequate in failing to seek out other testimony, we would conclude, for the reasons expressed by the post-conviction court, that petitioner has not shown that counsel's failure to obtain that testimony was prejudicial. Petitioner offered the declaration of Julien to establish that the trial court would have granted the suppression motion. However, as the post-conviction court explained, in light of the evidence provided by Izenberg concerning the mild and short-acting effects of petitioner's medications and the testimony of other witnesses that petitioner was lucid and alert at the time she consented, Julien's opinion that petitioner's ability to give consent was "likely compromised," which was not based on an accurate summary of petitioner's dosages or their timing, and which did not provide a standard for evaluating whether a person is experiencing lingering effects of medication, would not have affected the trial court's ruling on petitioner's suppression motion.[5] We conclude, therefore, that the failure to call

---

[5] Petitioner contends that the post-conviction court applied an incorrect legal standard in determining that the offered evidence would not have affected the trial court's ruling on the motion to suppress, contending that the proper question is whether it *could have* had a tendency to change the outcome. Petitioner is correct that, under *Green*, 357 Or at 323, a petitioner establishes prejudice under Article I, section 11, by showing that counsel's deficient performance "could have tended to affect the outcome of the case." But in evaluating the prejudicial effect of counsel's performance in the context of a suppression motion, the question is whether, had counsel performed adequately, the ruling on the motion would have been favorable to petitioner. *See Alne v. Nooth*, 288 Or App 307, 316, 406 P3d 109 (2017) ("To establish prejudice on a claim based on a trial counsel's failure to object to the admission of evidence, a petitioner must establish that the objection would have been well taken when the criminal case was tried. * * * The petitioner must then establish that, given the totality of the circumstances, the admission of the objectionable evidence had a tendency to affect the jury's verdict.").

Julien could not have had a tendency to affect the outcome of the trial. Accordingly, the post-conviction court did not err in rejecting petitioner's claim.

Affirmed.